# In the United States Court of Federal Claims

No. 14-899 C
Filed: May 19, 2015

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |
|---|---|
| | Assignment of Claims Act, |
| |    31 U.S.C. § 3727; |
| | Breach of Contract; |
| HSH NORDBANK AG, | Debt Collection Improvement Act, |
| |    31 U.S.C. § 3701; |
|          Plaintiff, | Equal Access to Justice Act, |
| v. |    28 U.S.C. § 2412; |
| | Implied Duty of Good Faith and Fair |
| THE UNITED STATES, | Dealing; |
| | Motion to Dismiss, |
|          Defendant. |    RCFC 12(b)(1), |
| |    RCFC 12(b)(6); |
| | Summary Judgment, |
| |    RCFC 56(c). |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**David C. Smith**, Kilpatrick Townsend and Stockton, LLP, Washington, D.C., Counsel for Plaintiff.

**David Alan Levitt**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

**BRADEN**, *Judge*.

## MEMORANDUM OPINION AND FINAL ORDER

## I.    RELEVANT FACTUAL BACKGROUND.[1]

CEP Funding, LLC and Columbia Energy Partners, LLC (collectively "CEP") were created to develop energy projects in the Pacific Northwest, including a wind-energy project in Oregon, known as the Echanis Wind Project ("the Project"). Compl. ¶ 6. HSH Nordbank AG ("Plaintiff") loaned CEP $25 million for the Project, secured by all of CEP's assets. Pl. App'x at 85–90 (February 26, 2010 Amendment No. 3 to Secured Promissory Note).

---

[1] The facts herein were derived from: Plaintiff's September 23, 2014 Complaint ("Compl.") and exhibits attached thereto ("Pl. Exs. A–B"); the Government's Appendix to the November 24, 2014 Motion To Dismiss ("Gov't App'x at 1–112"); and the Appendix to Plaintiff's January 12, 2015 Response ("Pl. App'x at 1–166"). A chronology is also set out in the Court Appendix: Chronology Of Factual Events, attached hereto.

On January 9, 2008, CEP submitted a Large Generator Interconnection Request to the Bonneville Power Administration ("BPA") to connect the Project to BPA's power transmission grid via the Harney County, Oregon substation.  Compl. ¶ 8.  To accommodate this request, BPA needed to upgrade its local power infrastructure, requiring substantial study, engineering, and construction work.  Compl. ¶ 9.

On September 17, 2008, CEP and BPA entered into Engineering and Procurement Agreement No. 08TX-13748 ("E&P Agreement").  Compl. ¶ 11.  Pursuant to the E&P Agreement, BPA agreed to conduct engineering studies and design facilities for the interconnection at CEP's expense.  Compl. ¶ 11.  Pursuant to the E&P Agreement and subsequent modifications, CEP paid BPA: $250,000 on September 25, 2008; $100,000 on December 2, 2008; $500,000 on October 20, 2010; $300,000 on March 6, 2012; and $475,000 on March 20, 2012.  Compl. ¶ 11.  The E&P Agreement required BPA, within a reasonable time after completion or termination of the interconnection, to provide CEP with an accounting of all expenses charged against CEP's deposits and to refund any residual payments not spent.  Compl. ¶ 13.

On October 21, 2008, CEP and BPA entered into Point-to-Point Transmission Service Agreement No. 08TX-13707 ("TSA").  Gov't App'x at 5–14.  The TSA allowed CEP to purchase and manage transmission service from BPA, pursuant to Transmission Service Requests ("TSRs").  Compl. ¶ 16.  BPA approved four TSRs, referred to as Tables 1A, 1B, 1C, and 1D.  Compl. ¶ 17.  Each TSR reserved a specific quantity of transmission service for CEP on a monthly basis for a specific term.[2]  Compl. ¶ 17.  After service commenced, CEP was obligated to make monthly payments in advance.  Compl. ¶ 18.  If CEP failed to pay, BPA had the unilateral right to suspend service or terminate the TSA.  Compl. ¶ 18.

In or around December 2008, the Project's proponents applied for a right-of-way ("ROW") from the Bureau of Land Management ("BLM").  Compl. ¶ 25.  A ROW was necessary, because the Project required construction of a power transmission line across federally owned land.  Compl. ¶ 24.  Before the ROW was approved, however, the BLM was required to prepare an environmental impact study, pursuant to the National Environmental Policy Act, 42 U.S.C. § 4321 et seq.  Compl. ¶ 24.

On July 30, 2010, CEP and BPA entered into Environmental Study Agreement No. 10TX-10511 ("ES Agreement").  Compl. ¶ 12.  Under the ES Agreement, BPA would conduct the environmental study at CEP's expense.  Compl. ¶ 12.  Pursuant to the ES Agreement, CEP made a deposit of at least $50,000.  Pl. Ex. B at 6.  The ES Agreement also required BPA, within a reasonable time after completion or termination of the interconnection, to provide CEP with an accounting of all expenses charged against CEP's deposits and to refund any unused funds.  Compl. ¶ 13.

---

[2] Each of the four TSRs required service to begin in December 2009, but CEP could defer commencement of service by paying a non-refundable annual reservation fee equal to one month's charge for transmission service.  Compl. ¶ 19.  From December 2009 to December 2011, CEP deferred commencement of service under all four TSRs.  Compl. ¶ 20.

On October 21, 2011, BLM issued a Final Environmental Impact Statement regarding the proposed transmission line.  Compl. ¶ 27.

BPA required CEP to take transmission services pursuant to Tables 1B and 1C beginning in December 2011 at a cost of $52,535 per month,[3] as required by Tables 1B and 1C.  Compl. ¶ 21.  In December 2011, however, CEP was late in submitting a request to defer transmission service for 2012, pursuant to Tables 1B and 1C.  Compl. ¶ 21.  Moreover, instead of using BPA's service itself, CEP sold the service to third parties.  Compl. ¶ 22.

On December 28, 2011, BLM approved the ROW request.  Compl. ¶ 27.

On February 29, 2012, CEP and BPA executed Modification No. 4 to the September 17, 2008 E&P Agreement, under which BPA agreed to continue the work necessary to complete the interconnection at project capacity.  Gov't App'x at 1–2.  CEP also increased its funding obligation from $850,000 to approximately $1.625 million.  Compl. ¶ 28.  CEP made two additional deposits to BPA: $300,000 on March 6, 2012; and $475,000 on March 20, 2012.  Compl. ¶ 30.

On April 5, 2012, the Oregon Natural Desert Association filed a lawsuit challenging BLM's environmental review of the ROW.  Compl. ¶ 31 (citing *Or. Natural Desert Ass'n v. Salazar*, No. 12-cv-596 (D. Or. filed April 5, 2012)).  In response, BPA informed CEP that it would suspend work on the interconnection while the lawsuit was pending.  Compl. ¶¶ 32–33.  On September 16, 2013, the United States District Court for the District of Oregon granted the Government's motion for summary judgment.  Compl. ¶ 31; *see also* Op. & Order, Dkt. No. 80, *Or. Natural Desert Ass'n*.

In mid-2012, CEP began to experience liquidity problems.  Compl. ¶ 34.  In early Fall 2012, CEP notified BPA that it was withdrawing its interconnection request.  Compl. ¶ 36.  On October 11, 2012, BPA informed CEP by email that it would refund CEP any unused funds.  Compl. ¶ 37.

In November 2012, CEP requested to defer transmission service, pursuant to Tables 1A and 1D.  Compl. ¶ 39.  BPA agreed to revise the TSA to effectuate the deferral, but CEP failed to pay the reservation fee.  Compl. ¶ 39.  Consequently, in December 2012, BPA required CEP to take transmission service, pursuant to Tables 1A and 1D.  Compl. ¶ 39.  This brought CEP's total monthly transmission fees to approximately $112,575 per month.  Compl. ¶ 39.  CEP, however, was unable to pay the entire monthly fee.  Compl. ¶ 41.

On January 30, 2013, CEP requested that BPA provide an accounting of all interconnection deposits and return any unused funds.  Gov't App'x at 77–78.  On March 28, 2013, BPA advised CEP that it owed BPA approximately $450,300 in transmission service fees.  Gov't App'x at 79–82.  BPA also refused to pay CEP any refund until the outstanding transmission service fees were paid.  Compl. ¶¶ 43–44.  BPA responded that the Debt Collection Improvement Act, 31 U.S.C. § 3716 ("DCIA"), authorized BPA to offset CEP's outstanding obligations against CEP's deposits.  Compl. ¶ 45.  BPA replied that, "[i]f CEP funding does not

---

[3] From December 2011 to December 2012, CEP continued to defer commencement of service, pursuant Tables 1A and 1D.  Compl. ¶ 23.

pay [for transmission service], [BPA] may, at its discretion and without notice, offset CEP Funding's funds associated with the CEP funding Agreements[.]" Gov't App'x at 81 (March 28, 2013 letter from BPA to CEP).

On April 15, 2013, CEP sent BPA a formal notice of dispute about BPA's failure to provide an accounting or pay any refunds. Gov't App'x at 84–86. On May 9, 2013, CEP and BPA engaged in informal dispute resolution, but a settlement was not reached. Gov't App'x at 87.

On June 28, 2013, BPA informed CEP that it owed approximately $960,040 for transmission service fees and declined to pay CEP any refund. Gov't App'x at 87–88. But, BPA did not advise CEP that it was exercising its right of offset pursuant to the DCIA. Compl. ¶ 47. Nor did BPA explain why it continued to decline to refund CEP approximately $230,000, *i.e.*, the amount of CEP deposits that exceeded BPA's transmission service fees. Compl. ¶ 47. On June 28, 2013, BPA also informed CEP that it would exercise its right to terminate the TSA, effective August 1, 2013, if CEP did not pay all outstanding transmission fees by July 31, 2013. Compl. ¶ 48.

In a July 23, 2013 Bill of Sale, CEP assigned all rights to the interconnection deposits to Plaintiff to satisfy CEP's obligations to Plaintiff. Gov't App'x at 96–108.

On August 1, 2013, BPA terminated the TSA, because of CEP's failure to pay the outstanding transmission fees by July 31, 2013. Compl. ¶ 49. At this time, CEP incurred approximately $960,000 in transmission fees that it could not use or was unable to re-sell. Compl. ¶ 49. Consequently, BPA declined to refund any unused funds, but never instituted any formal offset proceedings against CEP. Compl. ¶ 50.

On August 6, 2014, Plaintiff provided BPA written notice of CEP's assignment of interest in the interconnection deposits. Gov't App'x at 93–95.

## II. RELEVANT PROCEDURAL HISTORY.

On September 23, 2014, Plaintiff filed a Complaint in the United States Court of Federal Claims. On November 24, 2014, the Government filed a Motion To Dismiss ("Gov't Mot."), together with an appendix. On January 12, 2015, Plaintiff filed a Response ("Pl. Resp."), together with an appendix. On January 28, 2015, the Government filed a Reply ("Gov't Reply").

On April 6, 2015, the court convened an oral argument. At oral argument, the court directed the parties to file supplemental briefs.

On April 22, 2015, Plaintiff filed a supplemental brief ("Pl. Supp. Br."). On April 24, 2015, the Government filed a supplemental brief ("Gov't Supp. Br.").

## III. DISCUSSION.

### A. Jurisdiction.

The United States Court of Federal Claims has jurisdiction under the Tucker Act, 28 U.S.C. § 1491, "to render judgment upon any claim against the United States founded either

upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages . . . . [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398 (1976).

To pursue a substantive right under the Tucker Act, a plaintiff must identify and plead an independent contractual relationship, Constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages. *See Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act[.]"); *see also Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc*) ("The Tucker Act . . . does not create a substantive cause of action; . . . a plaintiff must identify a separate source of substantive law that creates the right to money damages. . . . [T]hat source must be 'money-mandating.'"). Specifically, a plaintiff must demonstrate that the source of substantive law upon which he relies "can fairly be interpreted as mandating compensation by the Federal Government[.]" *Testan*, 424 U.S. at 400. And, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) ("[O]nce the [trial] court's subject matter jurisdiction [is] put in question . . . . [the plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.").

## B.     Standard of Review Under RCFC 12(b)(1).

A challenge to the United States Court of Federal Claims' "general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rules of the United States Court of Federal Claims ("RCFC")] 12(b)(1) motion[.]" *Palmer v. United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999); *see also* RCFC 12(b)(1) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading . . . . But a party may assert the following defenses by motion: (1) lack of jurisdiction over the subject matter[.]"). When considering whether to dismiss an action for lack of subject matter jurisdiction, the court is "obligated to assume all factual allegations of the complaint to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).

## C.     Standard of Review Under RCFC 12(b)(6).

A challenge to the United States Court of Federal Claims' "[ability] to exercise its general power with regard to the facts peculiar to the specific claim . . . is raised by a [Rule] 12(b)(6) motion[.]" *Palmer*, 168 F.3d at 1313; *see also* RCFC 12(b)(6) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading . . . . But a party may assert the following defenses by motion: . . . (6) failure to state a claim upon which relief can be granted[.]").

When considering whether to dismiss an action for failure to state a claim, the court must assess whether "a claim has been stated adequately" and then whether "it may be supported by

[a] showing [of] any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007). The plaintiff's factual allegations must be substantial enough to raise the right to relief "above the speculative level." *Id.* at 555. The court must accept all factual allegations in the complaint as true and make all reasonable inferences in favor of the plaintiff. *Id.*

### D.      Standard Of Review For Summary Judgment Under RCFC 56(c).

On a motion for summary judgment, the moving party must establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Duramed Pharms., Inc. v. Paddock Labs., Inc.*, 644 F.3d 1376, 1380 (Fed. Cir. 2011); *see also* RCFC 56(c). Only genuine disputes of material fact that might affect the outcome of the suit preclude entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). The "existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48 (emphasis in original). "Courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

### E.      Counts I And II: Breach Of Contract And Breach Of Implied Covenant Of Good Faith And Fair Dealing.

#### 1.      Whether The Court Has Jurisdiction Over Counts I And II.

##### a.      The Government's Argument.

The Government argues that, as a matter of law, the court does not have jurisdiction to adjudicate Counts I and II of the September 23, 2014 Complaint, because Plaintiff's assignment of contractual rights does not establish privity between a private party assignee and the Government. *See Thomas Funding Corp. v. United States*, 15 Cl. Ct. 495, 500 (1988) ("[T]he plaintiff herein simply does not acquire privity of contract with the [G]overnment in a separate contract with its assignor[.]"); *see also Twin City Shipyard, Inc. v. United States*, 21 Cl. Ct. 582, 587–88 (1990) ("A valid assignment of contract proceeds, standing alone, does not create privity of contract between the assignee and the United States."); *see also Produce Factors Corp. v. United States*, 199 Ct. Cl. 572, 580 (1972) ("[T]he only effect of the Assignment of Claims Act of 1940 ["Claims Act"] was to remove the anti-assignment bar so as to permit contractors to finance their Federal contracts upon the security of assignments of the contract proceeds to be earned thereunder. While the assignee-lending institution indirectly benefits the Government through financing the contractor's performance, indirect benefits do not establish privity of contract with the United States.") (internal citations omitted). Nor is Plaintiff entitled to equitable subrogation, because "under the majority view, the issuer of an irrevocable letter of credit does not hold the position of surety even though it assumes obligations to the beneficiary of the letter of credit." Gov't Supp. Br. at 3.

Therefore, even if CEP's assignment to Plaintiff is valid, the court does not have jurisdiction to adjudicate the claims alleged in Counts I and II.

**b.       Plaintiff's Response.**

Plaintiff acknowledges that the Tucker Act requires privity between a plaintiff and the Government before the court can adjudicate breach of contract claims.  Pl. Resp. at 22 (citing *Erickson Air Crane Co. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984) ("The [G]overnment consents to be sued only by those with whom it has privity of contract[.]")).  But, this case fits within the subrogation exception.  Pl. Resp. at 22–23.  "As a general rule, subrogation applies where a party not acting voluntarily, but under some compulsion pays a debt or discharges an obligation for which another is primarily liable and which in equity and good conscience ought to be discharged by the latter."  *First Nat'l City Bank v. United States*, 212 Ct. Cl. 357, 369 (1977).  "But subrogation will be applied in favor of parties who act to protect their own interests."  *Id.*

Here, Plaintiff "provided sole financing for CEP's obligations to BPA[.]"  Pl. Resp. at 23. Plaintiff's "continued funding of CEP included payment (through CEP) of CEP's obligations, in the interest of protecting [Plaintiff's] own security interest[.]"  Pl. Resp. at 23.  As such, "[r]ecovery of the Interconnection Deposits is the only avenue by which [Plaintiff] may recover the amounts it paid to protect its interests."  Pl. Resp. at 24.  Therefore,

> [u]nder these circumstances[,] the [c]ourt should exercise its equitable power to subrogate [Plaintiff] to CEP's rights under the Interconnection Agreements and allow it to proceed on these claims against BPA.  Because [Plaintiff] may be equitably subrogated to CEP's contracts with the [G]overnment, privity is not required[,] and Tucker Act jurisdiction exists with respect to Counts [I] and [II].

Pl. Resp. at 24; *see also* Pl. Supp. Br. at 4–5.

**c.       The Court's Resolution.**

The Tucker Act requires privity of contract for a plaintiff to prevail on a breach of contract claim in the United States Court of Federal Claims.  *See Erickson Air Crane Co.*, 731 F.2d at 813 ("The [G]overnment consents to be sued only by those with whom it has privity of contract[.]").  Subrogation is an exception to this rule.  *See Ins. Co. of the W. v. United States*, 243 F.3d 1367, 1370 (Fed. Cir. 2001) ("Rather than relying on privity of contract, sureties traditionally have asserted claims against the [G]overnment under the equitable doctrine of subrogation.").

In *First National City Bank*, on which Plaintiff relies, multiple lenders provided loans to a Government contractor, and the plaintiff refinanced some third-party loans to protect its interest on loans it made to the contractor.  *See* 212 Ct. Cl. at 361–63; *see also id.* at 370 ("Clearly, under this principle [of subrogation,] plaintiff was no volunteer.  It did not pay [the contractor's] debt as a volunteer[,] but did so to protect its own interests in the prior loans[.]").  Importantly, prior to that lawsuit, the Government

had already elected to deal with plaintiff with respect to the [relevant] contract. [The Government] sent a copy of the agreement resolving the dispute . . . not to [the original financing institution] or the [Government] but to plaintiff; the [Government] also haggled with plaintiff over whether the [plaintiff] should have priority before any setoff; and the [Government] appears in effect to have determined that [plaintiff] was at least entitled to $7,812 without any setoff. Thus, by its own choice [the Government] treated [plaintiff] as an interested party. Where that has happened it seems an unwholesome technical rigidity to apply the principles underlying the pre-1940 anti-assignment statute to lock the barn after the horse has deliberately been let out by the Government's own officials.

*Id.* at 370–71.

This case is distinguishable from *First National City Bank* on two grounds. First, Plaintiff did not refinance any third-party debt with CPE. Instead, Plaintiff made repeated loans to cover CEP's deposits with BPA. Pl. Resp. at 23 ("[Plaintiff] provided sole financing for CEP's obligations to BPA under both the Transmission Service Agreement (and TSRs) and the Interconnection Agreements. This included payment to BPA of the $1.6 million in Interconnection Deposits, as well as payment of transmission fees of approximately $52,000 per month for all of 2012."); *see also* Gov't App'x at 45–46 (Jan. 17, 2013 demand letter from BPA to CEP for $52,535 for one month of service); Gov't App'x at 79 (Mar. 28, 2013 letter from BPA to CEP explaining that CEP advanced $1,675,000 to BPA). As such, Plaintiff did not "pay another's debts to protect [its] own rights and interests." *First Nat'l City Bank*, 212 Cl. Ct. at 369. Instead, it functioned as CEP's primary lender.

Second, the Government had no dealings with Plaintiff prior to this lawsuit. Unlike *First National City Bank*, the Government did not provide contract documents or negotiate setoff priority with Plaintiff. Instead, the evidence demonstrated that the Government communicated only with CEP until it received formal notice of the assignment on August 6, 2014.

In addition, there is no indication that Plaintiff acted as a surety for CEP, such that Plaintiff had standing to bring a breach of contract claim against the Government. According to the RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY (1996) ("RESTATEMENT"),

> An obligee has recourse against a secondary obligor or its property with respect to an underlying obligation whenever:
> (a) the principal obligor owes performance of the underlying obligation; and
> (b) pursuant to the secondary obligation, either:
>> (i) the secondary obligor has a duty to effect, in whole or in part, the performance that is the subject of the underlying obligation; or
>> (ii) the obligee has recourse against the secondary obligor or its property in the event of the failure of the principal obligor to perform the underlying obligation; or
>> (iii) the obligee may subsequently require the secondary obligor to either purchase the underlying obligation from the obligee or incur the duties described in subparagraph (i) or (ii).

RESTATEMENT § 1(2).

In this case, § 1(2)(a) of the RESTATEMENT's two-element test is satisfied, because CEP as the principal obligor owed performance of the underlying obligation, *i.e.*, payment, to the Government. But, Plaintiff did not satisfy § 1(2)(b), because none of the three disjunctive subparts is met. First, the secondary Plaintiff had no "duty to effect, in whole or in part," CEP's payment to the Government. *See* RESTATEMENT § 1(2)(b)(i). Second, the Government did not have "recourse against [Plaintiff] in the event of the failure of the [CEP] to perform the underlying obligation." RESTATEMENT § 1(2)(b)(ii). Third, the Government had no right to "subsequently require [Plaintiff] to either purchase the underlying obligation from the [Government]" or otherwise perform. RESTATEMENT § 1(2)(b)(iii). Moreover, the "requisites of contract formation"—mutual assent and consideration—are not present between Plaintiff and the Government. *See* RESTATEMENT § 7 ("The requisites of contract formation apply generally to formation of a contract creating a secondary obligation.").

Even if Plaintiff were a surety, the United States Court of Appeals for the Federal Circuit has "specified two circumstances in which a surety may succeed to the contractual rights of a contractor against the [G]overnment: when the surety takes over contract performance or when it finances completion of the defaulted contract." *Ins. Co. of the W.*, 243 F.3d at 1370. Plaintiff, however, never assumed CEP's performance obligations; nor did Plaintiff assume CEP's debts. *See* Pl. App'x at 40–84 (Dec. 14, 2007 Secured Promissory Note); Pl. App'x at 85–90 (Feb. 26, 2010 Amendment No. 3 to Secured Promissory Note); Pl. App'x at 91–95 (Dec. 3, 2012 Amendment No. 8 to Secured Promissory Note); Pl. App'x at 1–39 (Oct. 5, 2010 Pledge and Security Agreement). In addition, since Plaintiff failed to establish either an express or implied contract with BPA, its dependent claim for a breach of implied covenant of good faith and fair dealing also must be dismissed. *See Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) ("Every *contract* imposes upon each party a duty of good faith and fair dealing in its performance and enforcement.") (emphasis added).

For these reasons, the court has determined that, as a matter of law, it does not have jurisdiction to adjudicate Counts I and II of the September 23, 2014 Complaint. *See* RCFC 12(b)(1).

## 2.   Whether The September 23, 2014 Complaint Stated A Claim Upon Which Relief Can Be Granted.

### a.   The Government's Argument.

The Government also argues that Counts I and II of Plaintiff's September 23, 2014 Complaint should be dismissed, because Plaintiff "does not assert the existence of an express or implied-in-fact contract between [Plaintiff] and BPA in its [C]omplaint or a breach of that contract." Gov't Mot. at 17. In fact, Plaintiff "acknowledges that the contracts it alleges were breached were between CEP Funding and BPA, not between [Plaintiff] and BPA." Gov't Mot. at 17 (citing Compl. ¶¶ 55–69). Instead, Plaintiff "merely provided CEP with monies needed to fund CEP's operations. Therefore, [Plaintiff] had no third party obligation to ensure CEP's performance to BPA and is simply a financing company, not a surety." Gov't Reply at 12–13. Unlike *First National City Bank*, Plaintiff did not refinance third-party debt. *See* 212 Ct. Cl. at 362–63.

b.      **Plaintiff's Response.**

Plaintiff's response repeats previous arguments that equitable subrogation should apply.

c.      **The Court's Resolution.**

"To state a claim upon which relief can be granted, [a plaintiff] must allege either an express or an implied-in-fact contract, and the breach of that contract." *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997). Plaintiff's September 23, 2014 Complaint does not allege that Plaintiff had an express or implied-in-fact contract with the Government.

For this reason, the court has determined that Plaintiff also failed to state a claim upon which relief can be granted as to Counts I and II. *See* RCFC 12(b)(6).

F.      **Count III: Return Of Deposits Under The Assignment Of Claims Act.**

1.      **Whether To Convert The Government's November 24, 2014 Motion To Dismiss Into A Motion For Summary Judgment.**

Plaintiff argues that the Government's November 24, 2014 Motion To Dismiss relies on facts in a 112-page appendix, outside the pleadings, and thus should be converted into a Motion For Summary Judgment. Pl. Resp. at 10–11 (citing Gov't App'x at 1–112). Therefore, the court should disregard the evidence, or in the alternative, convert the motion to one for summary judgment and allow full presentation of evidence. Pl. Resp. at 12 (citing RCFC 12(d)[4]; *see also G4S Tech. LLC v. United States*, 114 Fed. Cl. 662, 669 (2014) ("[W]hen the court considers— and does not exclude—materials outside of the pleadings, dismissal under RCFC 12(b)(6) or 12(c) is not appropriate. Rather, such a motion must be converted into one for summary judgment under RCFC 56(c).") (internal citations omitted).

---

[4] RCFC 12(d) provides:

If, on a motion under RCFC 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under RCFC 56. All parties must be given a reasonable opportunity to present all material that is pertinent to the motion.

RCFC 12(d).

"The question whether a party has had a 'reasonable opportunity' to present pertinent summary judgment materials when a trial court converts a motion to dismiss into a motion for summary judgment necessarily turns on the way in which the particular case under consideration has unfolded." *Easter v. United States*, 575 F.3d 1332, 1336 (Fed. Cir. 2009) (internal quotation marks and citation omitted).

The Government does not dispute that RCFC 12(d) requires the court to consider this issue on summary judgment. Gov't Reply at 3. And, Plaintiff presented a 166-page Appendix with its January 12, 2015 Response. Gov't Reply at 3.

For these reasons, the court will adjudicate the Government's November 24, 2014 Motion To Dismiss regarding Count III as a Motion For Summary Judgment.

### 2.    The Merits.

#### a.    The Government's Argument.

The Government posits three reasons why Count III should be dismissed. First, Plaintiff failed to notify the Government of the alleged assignment until it was too late. Gov't Mot. 18–19 (citing *United Cal. Discount Corp. v. United States*, 19 Cl. Ct. 504, 507–08 (1990) (holding that failure to comply with formal notice requirements prior to the termination of a contract "come[s] too late to perfect an assignment" on behalf of the assignee")). Therefore, Plaintiff forfeited any right to unspent deposits under the Claims Act on August 1, 2013, the date that BPA terminated the TSA. Gov't Mot. at 19.

Second, Plaintiff's claim also does not comply with the financing institution exemption to the Claims Act. Gov't Mot. at 19 (citing 41 U.S.C. § 6306(b)(2); 31 U.S.C. § 3727(c) (exempting an assignment to a financial institution "to secure funding for carrying out obligations to the Government")). CEP, however, did not "secure financing to carry out obligations to the Government," but only assigned the claims to Plaintiff as payment on the loan. Gov't Mot. at 20. Notably, the Complaint confirms that Plaintiff accepted the assignment "[i]n lieu of foreclosure, and in satisfaction of [CEP Funding's] obligations to [Plaintiff.]" Compl. ¶ 52. As such, CEP's assignment does not qualify under this limited exemption.

Third, "it is well-established that the Claims Act only accords standing to the assignee to recover improper payments the Government may have made to third parties but not funds the Government allegedly improperly withheld from the assignor." Gov't Mot. at 21 (citing *Twin City Shipyard, Inc.*, 21 Cl. Ct. at 588 ("A party to whom a [G]overnment contract has been validly assigned under the Assignment of Claims Act . . . . cannot maintain an action for breach of contract, but only to recover money wrongfully paid to a third party."); *see also Thomas Funding Corp.*, 15 Cl. Ct. at 502 ("[A]n assignee to the proceeds of a [G]overnment contract under the Assignment of Claims Act . . . . may only bring a suit against the [G]overnment for wrongful payment to a third party, and may not maintain an action for breach of contract in this court."). Count III "does not allege an improper transfer of funds to a third party"; thus, it is "actually an impermissible breach of contract claim[.]" Gov't Mot. at 22.

#### b.    Plaintiff's Response.

Plaintiff responds that the Government's assignment analysis is wrong, because BPA's offset did not comply with the DCIA.[5] Pl. Resp. at 11–13. As such, "the administrative offset

---

[5] The DCIA requires an agency asserting an offset to provide:

was not effective and the Interconnection Deposits were still in existence when the [G]overnment was notified of the assignment." Pl. Resp. at 13.

The Government also failed to meet its common law obligation to establish entitlement to contract damages. Pl. Resp. at 13–14 (citing *Rumley v. United States*, 152 Ct. Cl. 166, 171–72 (1961) (holding that the Government must "satisfy its burden of proving [contract] damages")). Here, "CEP assigned the Interconnection Deposits to [Plaintiff] prior to any alleged set-off." Pl. Resp. at 14. Therefore, although CEP's Board did not ratify the assignment until July 2014, "the corporate officers who executed the assignment in July 2013 were fully authorized to do so and the assignment was effective at that time." Pl. Resp. at 14. Moreover, there are several substantive problems with the amount of BPA's purported offset.[6] Pl. Resp. at 14–15.

Plaintiff also contends that the Claims Act is not limited to securing financing to carry out obligations to the Government. Pl. Resp. at 15–16. The intent of the Claims Act was to "help contractors 'secure financing for carrying out obligations to the Government.'" Pl. Resp. at 16 (quoting Gov't Mot. at 19). But, the text of the statute indicates that it applies "to any 'contract providing for payments totaling at least $1,000' if the contract does not forbid the assignment, notice is provided to the agency, and certain other requirements (not at issue here) are met." Pl. Resp. at 16 (quoting 31 U.S.C. § 3727(c)). Therefore, all of the requirements of the Claims Act are met in this case. Pl. Resp. at 16–17.

Finally, this case fits into an exception to the general rule that the Claims Act allows an assignee to pursue a claim, only if the Government improperly paid a third party. Pl. Resp. at 18. This case is analogous to *Goodman v. Niblack*, 102 U.S. 556 (1880), where an insolvent party voluntarily assigned "all [its] effects" for the benefit of its secured creditor, without implicating the "mischiefs" the Anti-Assignment Acts were designed to remedy. *Id.* at 560–61. Accordingly, "this case falls within the judicially-recognized exceptions to the general rule," because CEP's voluntary transfer is similar to "a transfer in bankruptcy or an assignment for the benefit of creditors, both of which have been held not to be restricted by [the Claims Act]." Pl. Resp. at 21. Moreover, even if the Claims Act did bar Plaintiff's claim, the Government's

---

1. [W]ritten notice of the type and amount of the claim, the [agency's intention] to collect the claim by administrative offset, and an explanation of the rights of the debtor under [the DCIA];
2. [A]n opportunity to inspect and copy the records of the agency related to the claim;
3. [A]n opportunity for a review within the agency of the decision of the agency related to the claim; and
4. [A]n opportunity to make a written agreement with the head of the agency to repay the amount of the claim.

31 U.S.C. § 3716(a).

[6] For example, the Government did "not support its calculation [of approximately $34 million in contract damages] or indicate why it could not have mitigated its damages by selling transmission service to other customers." Pl. Resp. at 15.

refusal to refund deposits to Plaintiff would constitute a taking under the Fifth Amendment of the United States Constitution.  Pl. Resp. at 21–22.[7]

### c.  The Government's Reply.

The Government replies that even if the assignment were executed in July 2013 (prior to the August 2013 offset), "the assignment only was valid *after* [Plaintiff] provided notice and a copy of the deed to BPA."  Gov't Reply at 4 (citing *United Cal. Discount Grp.*, 19 Cl. Ct. at 508 ("The notice provisions of the [Claims Act] require the assignee to file a written notice of the assignment *and* a copy of the assignment with the contracting official *and* the disbursing official.") (emphasis in original); *Reliance Ins. Co. v. United States*, 15 Cl. Ct. 62, 66 (1988) ("It is settled that the third-party plaintiff's rights, as assignee, attach from the date the assignee filed a proper Notice of Assignment together with a properly executed assignment, in conformance with the [Claims Act.]")).  Plaintiff, however, did not provide notice until August 6, 2014.  Gov't Reply at 4.  In other words, the August 1, 2013 offset preceded the assignment.  Gov't Reply at 4.

Plaintiff's understanding of an administrative offset is also "fundamentally flawed."  Gov't Reply at 5.  An administrative offset is "the power an agency has to *unilaterally* offset the money the agency estimates a person owes to the agency against the amount the agency owes that person."  Gov't Reply at 5 (emphasis in original).  Agencies have a "long-standing common law right to offset contract debts against contract payments."  *Cecile Indus., Inc. v. Cheney*, 995 F.2d 1052, 1054 (Fed. Cir. 1993).  "In situations where debts and credits arise within a single agency, the [Debt Collection Act of 1982, 31 U.S.C. § 3716 ("DCA")] authorizes the agency to act without Treasury intervention.  The DCA explicitly provides that this can be done 'under statute or common law.'"  Gov't Reply at 6 (quoting 31 U.S.C. § 3716(d)).  Moreover, *Cecile Industries* interpreted the Debt Collection Act of 1982 ("DCA"), not the later Debt Collection Improvement Act of 1996 ("DCIA").  *See Cecile Indus.*, 995 F.2d at 1053.  But, the relevant statutory provision—31 U.S.C. § 3716(a)—is identical under both Acts.

Therefore, Government complied both with the DCA's statutory requirements and common law principles.  Gov't Reply at 7.

### d.  The Court's Resolution.

The Claims Act was "enacted so that the [G]overnment would always be able to 'deal exclusively with the original claimant' and would always be aware of its obligations."  *United Cal. Discount Corp.*, 19 Cl. Ct. at 507 (quoting *Patterson v. United States*, 173 Ct. Cl. 819, 823 (1965)).  Later, "Congress amended the [Claims Act] to include a financing institution exception to the bar on assignments."  *Id.*  But, the Claims Act's "notice provisions are clear; they require the contractor to give written notification of the assignment, together with a true copy of the instrument of assignment, to the contracting officer or official and to the disbursing officer or

---

[7] But, this claim is not in Plaintiff's September 23, 2014 Complaint.  Even if this claim were in Plaintiff's Complaint, "the Federal Rules do not require the court to credit a complaint's conclusory statements without reference to its factual content."  *Ashcroft*, 556 U.S. at 686.  Plaintiff provided no factual content to establish a taking under the Fifth Amendment.

official." *Id.* (citing 41 U.S.C. § 15[8]). "The language of the [financing institution] exception indicates that Congress still sought to protect the [G]overnment from the uncertainties devolving from secret assignments. To that end, *the financing institution exception is strictly construed*, and the contractor must meet the requirements of that section to gain the benefit of the exception." *Id.* (emphasis added). "[F]ailure of the contractor to abide by the notice provisions of the financing institution exception will invalidate the assignment." *Id.* at 507–08. "The notice provisions of the [Claims Act] require the assignee to file a written notice of the assignment *and* a copy of the assignment with the contracting official *and* the disbursing official." *Id.* at 508 (citing 41 U.S.C. § 15) (emphasis in original). "An assignment against the [G]overnment will be effective, if at all, only *after* proper notification." *Id.* (citing *Reliance Ins. Co.*, 15 Cl. Ct. at 66) (emphasis in original).

Plaintiff insists that the Government's offset did not comply with the DCIA, rendering the timing of notification irrelevant. Pl. Resp. at 11–13 (citing 31 U.S.C. § 3716(a)). But, the Government was not required to comply with the DCIA, because the DCIA does not displace "the Government's long-standing common law right to offset contract debts to the United States against contract payments due to the debtor." *Cecile Indus.*, 995 F.2d at 1054. As the United States Supreme Court has held, "The [G]overnment has the same right which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him." *United States v. Munsey Trust Co.*, 332 U.S. 234, 239 (1947) (internal quotation marks and citation omitted). The right of offset "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995) (quoting *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528 (1913)). "[T]he right to offset applies to inter-contractual debts as well as intra-contractual debts." *Cecile Indus.*, 995 F.2d at 1054. As such, an offset requires the Government to complete three steps: "(i) a decision to effectuate a[n offset], (ii) some action accomplishing the [offset], and (iii) a recording of the [offset]."[9] *Citizens Bank*, 516 U.S. at 19; *see also Johnson v. All-State Constr., Inc.*, 329 F.3d 848, 854 (Fed. Cir. 2003) (same).

In this case, the Government performed an inter-contractual offset of Plaintiff's arrearages and estimated damages against Plaintiff's deposits, because the arrearages and deposits stemmed from the same contract. Like *Cecile Industries*, the Government "did not need

---

[8] As of January 4, 2011, 41 U.S.C. § 15 now is cited as 41 U.S.C. § 6305. Section 6305 provides:

> The assignee of an assignment under this subsection shall file written notice of the assignment and a true copy of the instrument of assignment with—
>     (A) the contracting officer or head of the officer's department or agency;
>     (B) the surety on any bond connected with the contract; and
>     (C) the disbursing officer, if any, designated in the contract to make payment.

41 U.S.C. § 6305(b)(6).

[9] *Citizens Bank* used the term "setoff," but acknowledged that "[t]he right of setoff" is "also called [an] 'offset.'" *Citizens Bank*, 516 U.S. at 18.

to avail itself of section 3716 for any of the offsets," because "[n]owhere does the language, context, or enactment history of the [DCIA] suggest restriction or replacement of doctrines permitting contractual offsets." 995 F.2d at 1056. The Government only had to comply with the common law obligations, discussed in *Citizens Bank*. Namely, the Government first made "a decision to effectuate" the offset. Gov't App'x at 81 (Mar. 28, 2013 letter from BPA to CEP, explaining that "[i]f CEP Funding does not pay, [BPA] may, at is discretion and without notice, offset CEP Funding's funds"); Gov't App'x at 90 (Aug. 23, 2013 letter from BPA to CEP, explaining that BPA "is exercising its right to an administrative offset and setoff and applying the entire amount owed to CEP Funding against the amount owed by CEP Funding"). In addition, the Government took "some action accomplishing the [offset]" by declining to return CEP's deposits and applied them against the amount that CEP owed BPA. Gov't App'x at 90. Moreover, the Government made "a recording of the [offset]" by explaining its actions, in writing, to CEP. Gov't App'x at 81 (Mar. 28, 2013 letter); Gov't App'x at 89–90 (Aug. 23, 2013 letter). Therefore, the Government was within its rights to effect a common law offset, not subject to the DCIA.

In the alternative, Plaintiff argues that the July, 23 2013 ratification of its assignment was effective prior to the Government's August 1, 2013 offset. Pl. Resp. at 14. But, Plaintiff did not provide notice of the assignment to the Government until August 6, 2014. Compl. ¶ 54 ("The Bank provided BPA written notice of the assignment of CEP's interest in the Interconnection Deposits to the Bank on August 6, 2014."). The Claims Act authorizes assignments only "when . . . the assignee files a written notice of assignment . . . with the contracting official or the head of the agency[.]" 31 U.S.C. § 3727(c)(3). Therefore, the July 23, 2013 ratification was not sufficient, because it was not a written notice filed with the contracting official or the head of BPA. As the record reflects, the Government did not receive "a written notice of the assignment" prior to August 6, 2014. *Compare* Compl. ¶ 53 ("CEP assigned to the Bank all of CEP's rights to the Interconnection Deposits in a Bill of Sale executed on July 23, 2013."), *with* Compl. ¶ 54 ("The Bank provided BPA written notice of the assignment of CEP's interest in the Interconnection Deposits to the Bank on August 6, 2014."). Therefore, Plaintiff failed to provide proper notice of the assignment to the Government prior to the August 1, 2013 offset.

For these reasons, the court has determined that there is no genuine issue of material fact at issue and that the Government is entitled to judgment as a matter of law as to Count III of Plaintiff's September 23, 2014 Complaint. *See* RCFC 56(c).

### G.    Count IV: Attorneys' Fees Pursuant To The Equal Access To Justice Act.

Plaintiff argues it "is entitled to an award of attorneys' fees in this action under the Equal Access to Justice Act, 28 U.S.C. § 2412" ("EAJA"). Compl. ¶ 76. The EAJA provides that "a [federal trial] court shall award to a prevailing party other than the United States fees and expenses . . . in any civil action . . . brought by or against the United States *in any court having jurisdiction of that action*[.]" 28 U.S.C. § 2412(d)(1)(A) (emphasis added). To adjudicate a claim under the EAJA, the court must have an independent basis of jurisdiction for the underlying claim. *See Burkhardt v. Gober*, 232 F.3d 1363, 1368 (Fed. Cir. 2000) ("The Court of Appeals for Veterans Claims . . . determined that it did not have jurisdiction over the claim that gave rise to the contested fees and expenses. . . . [T]he Court of Appeals for Veterans Claims was correct in interpreting the language of the EAJA to preclude [it] from awarding [the

plaintiff] the fees incurred in that claim."); *see also Melkonyan v. Sullivan*, 501 U.S. 89, 91 (1991) ("A party *that prevails* against the United States in a civil action is entitled, in certain circumstances, to an award of attorney's fees, court costs, and other expenses.") (emphasis added).

Because Plaintiff is not a prevailing party, Plaintiff is not entitled to attorneys' fees under the EAJA.  Therefore, Count IV of the September 23, 2014 Complaint is dismissed.  *See* 28 U.S.C. § 2412(d)(1)(A).

## IV.    CONCLUSION.

For the reasons discussed herein, pursuant to RCFC 12(b)(1), RCFC 12(b)(6), and RCFC 56(c), Plaintiff's September 23, 2014 Complaint must be dismissed.  The Clerk of Court is directed to dismiss Plaintiff's September 23, 2014 Complaint.

**IT IS SO ORDERED.**


/s/ Susan G. Braden
**Susan G. Braden,**
**Judge**

**COURT APPENDIX: CHRONOLOGY OF FACTUAL EVENTS**

| DATE | EVENT |
|---|---|
| 1/9/2008 | CEP submitted Large Generator Interconnection Request to the Bonneville Power Administration. |
| 9/17/2008 | CEP and BPA entered into Engineering and Procurement Agreement No. 08TX-13748. |
| 9/25/2008 | CEP paid BPA $250,000. |
| 10/21/2008 | CEP and BPA entered into Point-To-Point Transmission Service Agreement No. 08TX-13707. |
| 12/2/2008 | CEP paid BPA $100,000. |
| 12/2008 | Project's proponents applied for a Right-of-Way from the Bureau of Land Management. |
| 12/2009 | Required date to begin service, pursuant to the four Transmission Service Requests.  CEP commenced payment of non-refundable annual reservation fee, amounting to one month's charge for transmission service. |
| 2/26/2010 | Date of $25 million Secured Promissory Note (Amendment No.3) by which Plaintiff loaned CEP Funding LLC and Columbia Energy Partners LLC money secured by all of CEP's assets. |
| 7/30/2010 | CEP and BPA entered into Environmental Study Agreement No. 10TX-10511. |
| 10/20/2010 | CEP paid BPA $500,000. |
| 10/21/2011 | BLM issued a Final Environmental Impact Statement. |
| 12/2011 | CEP was late in submitting a request to defer transmission service for 2012 under Tables 1B and 1C. |
| 12/2011 | CEP ceased payment of non-refundable annual reservation fee amounting to one month's charge for transmission service. |
| 12/28/2011 | BLM approved the Right of Way request. |
| 2/29/2012 | CEP and BLM executed Modification No.4 of the September 17, 2008 E&P Agreement. |
| 3/6/2012 | CEP paid BPA $300,000. |
| 3/20/2012 | CEP paid BPA $475,000. |
| 4/5/2012 | Oregon Natural Desert Association filed a lawsuit in the United States District Court for the District of Oregon challenging BLM's environmental review of the Right of Way. |
| 4/2012 | BPA informed CEP that it would cease performance after April 2012, because of the Oregon Natural Desert Association lawsuit. |
| Mid-2012 | CEP began to experience liquidity problems. |
| Early Fall 2012 | CEP notified BPA that it was withdrawing its interconnection request. |
| 10/11/2012 | BPA informed CEP by email that it would refund CEP funds not used. |
| 11/2012 | CEP requested BPA to defer transmission service under Tables 1A and 1D. BPA revised the TSA to effect the deferral, but CEP failed to pay reservation fee. |
| 12/2012 | BPA required CEP to take transmission service, under Tables 1A and 1D. |

1

| | |
|---|---|
| 1/30/2013 | CEP requested that BPA provide an accounting of all interconnection deposits and return any funds not used. |
| 3/28/2013 | BPA responded that CEP owed BPA approximately $450,300 in transmission service fees.  BPA refused to make any refunds until the transmission service fees were paid. |
| 4/15/2013 | CEP sent BPA a formal notice disputing BPA's failure to provide an accounting or refund of CEP's deposits.  CEP requested an informal dispute resolution. |
| 5/9/2013 | CEP and BPA engaged in informal dispute resolution. |
| 6/28/2013 | BPA informed CEP that BPA was owed approximately $960,040 for transmission service fees and declined to refund CEP any monies. BPA did not inform CEP that it was exercising an off-set under DCIA. |
| 6/28/2013 | BPA informed CEP that it would exercise its right to terminate the TSA from August 1, 2013 if CEP did not pay all outstanding transmission fees by July 31, 2013. |
| 7/23/2013 | CEP assigned all rights to the interconnection deposits, pursuant to a Bill of Sale to Plaintiff in lieu of foreclosure. |
| 7/31/2013 | BPA's stated deadline for CEP to pay all outstanding transmission fees. |
| 8/1/2013 | BPA terminated the TSA, because of CEP's failure to pay outstanding transmission fees by July 31, 2013. |
| 8/6/2013 | Plaintiff provided BPA written notice of CEP's assignment of interest in the interconnection deposits. |
| 9/16/2013 | United States District Court for the District of Oregon granted Government's motion for summary judgment. |